**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARGARET JONES** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 5476 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **CAROLYN COLVIN,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Margaret Jones ("Plaintiff" or "Jones") seeks judicial review of a final

decision of Defendant Carolyn Colvin, the Acting Commissioner of Social Security

("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits

and Supplemental Security Income benefits ("SSI") under Title II of the Social Security Act,

and Jones filed a Motion for Summary Judgment that seeks to reverse the Commissioner's

decision. The Commissioner filed a cross-motion. The parties have consented to have

this Court conduct all proceedings in this case, including an entry of final judgment. 28

U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, both Plaintiff's and the

Commissioner's motions [12, 22] are granted in part and denied in part.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is

disabled. An individual does so by showing that he cannot "engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 4243(d)(1)(A).  Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  *See* 20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(I).  It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii).  At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform

2

in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an administrative law judge's ("ALJ") decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A. Medical History

Jones began to experience severe back pain in late 2008, several months after she

underwent bariatric surgery. On April 13, 2009, Jones consulted Dr. Cary Templin, who noted that her pain level had increased recently and that Jones rated it as 8 out of a scale of 10. He ordered MRIs of the cervical and thoracic spine. The results did not suggest any significant problems. An MRI of the lower spine indicated mild spondylosis changes, but no spinal or foraminal stenosis was noted. (R. 337). Jones was prescribed Vicodin to control her pain.

Jones also consulted Dr. Donald Roland about her back problems in April 2009. Dr. Roland believed that facet degenerative changes could be the cause for her discomfort. He recommended that she undergo lumbar epidural steroid injections and added new medications to control her pain. These included a Fentanyl (Duragesic) patch, Celebrex, and Valium. (R. 402-03). By the end of May 2009, Dr. Roland noted that these injections had only provided limited relief. He added lidoderm and a TENS unit to Jones' treatment. (R. 432). In the summer of 2009, Dr. John Kalec added the muscle relaxant Skelaxin to Jones' medications, suggesting that she alternate it with the Valium.

The opioid pain medication Jones was taking created some concern about potential abuse of these drugs, though the record is far from clear on this issue. On May 19, 2009, Jones was referred to pain psychologist Dr. Peter Brown to assess her suitability for taking such medication. Dr. Brown noted that Jones experienced "diminished" levels of activity, had no medication side effects, but also had "below normal" activities of daily living. No signs of drug misuse were found to exist. Dr. Brown concluded that Jones presented only a low risk of abusing her pain medications. (R. 379-80).

In November 2009, Dr. Sumin Shah continued to prescribe a potent array of pain medications and muscle relaxants for Plaintiff. These included up to 8 Norco tablets a day,

4

Valium twice and Skelaxin once a day, and a Fentanyl patch. (R. 584). In an attempt to give Jones greater relief, Dr. Roland performed a radio frequency nerve ablation on four vertebrae in February 2010. (R. 611-13). Jones did not receive any pain relief from this procedure. (R. 616). By July 2010, Dr. Kalec was injecting Jones' hips for low back pain that radiated to her knees. Again, she reported no relief from these injections. (R. 623).

In addition to back pain, Jones also began to experience serious pain in her knees due to osteoarthritis. Dr. Shah injected both of Jones' knees with steroids in September 2009. (R. 528-29). She received additional injections in January 2010. In June 2010, Dr. Gregory Markarian diagnosed Jones with bilateral knee arthritis and medial meniscus tears in both knees. (R. 602). On July 2, 2010, Jones underwent surgery on both knees and presented at the October 2010 hearing on crutches.

### B.    Physician Reports

### 1.    Dr. Sumin Shah

Treating physician Dr. Sumin Shah issued an "Arthritic Report" on October 12, 2009. He noted that Jones had degenerative disc disease in her spine and bilateral osteoarthritis in her knees. Dr. Shah believed that Jones would only be able to sit and stand for one hour at a time and would need to alternate the position for at least 30 minutes. Dr. Shah noted that the spinal injections that Jones received had only provided temporary relief, though no side effects resulted from these facet and epidural injections. (R. 525-26). Dr. Shah also issued a letter dated June 15, 2010 that described Jones' medical history. The letter restricted Jones' ability to stand to only 30 minutes, not the hour stated in the earlier Arthritic Report. She could not bend, crawl, or stoop without pain. Dr. Shah also noted

that Jones could not take non-steroidal anti-inflammatory medications because of her prior bariatric surgery.  (R. 601).

### 2.    Dr. Laura Rosch

On August 4, 2010, Dr. Laura Rosch issued a medical source statement for the SSA.  Dr. Rosch concluded that Jones could lift slightly less than 10 pounds occasionally.  (R. 633).  Jones could sit for two hours at a time for up to six hours a day, but she could only stand and walk for fifteen minutes at a stretch.  Dr. Rosch also assessed numerous restrictions in Jones' capacity to reach, stoop, and bend, as well as several environmental limitations such never working at unprotected heights.  (R. 636-38).  Dr. Rosch also issued a Medical Interrogatory for the SSA that reviewed the medical record and concluded that none of Jones' limitations met or medically equaled a Listing.  (R. 640-42).

### 3.    Dr. Sandra Bilinsky

On July 15, 2009, state agency physician Dr. Sandra Bilinsky issued a physical residual functional capacity assessment ("RFC") for Jones.  Dr. Bilinsky found that Jones could lift up to 20 pounds occasionally, and 10 pounds frequently.  She could stand for two hours a day and sit for up to six hours.  No limitations were found in Jones' ability to push or pull, but Dr. Bilinsky determined that Jones could only climb stairs, balance, kneel, or crawl on occasion.  (R. 416-23).

### C.    Hearing Testimony

Jones appeared at the October 19, 2010 hearing held before ALJ Marlene Abrams.  Much of her testimony concerned limitations stemming from her pain and the side effects of the pain medication.  Jones stated that her medication often made her sleepy and that

she takes two naps a day for up to 45 minutes each. (R. 64, 71). She must also lie down if she has pain until the medication starts to alleviate her discomfort. (R. 80).

Jones described a limited range of daily activities. Before her husband was laid off from work in June 2010, she drove him to and from work each day. She is able to clean and care for herself. However, her husband must help her negotiate steps in her shower. She is able to cook once in a while, but she must take pain medication in order to do so. (R. 68). Jones' husband helps her with the laundry by carrying the clothes basket down the stairs; a friend helps with cleaning the floors and vacuuming. (R. 69). Most of Jones' day is spent watching television and napping. Although her husband was currently not working, Jones used to drive him to and from his job. (R. 70). Jones stated that she looks through a newspaper from time to time, but her "concentration is nil." (R. 82).

Medical expert Dr. Sheldon Slodki also testified at the hearing. Dr. Slodki summarized the medical record and stated that he agreed with Dr. Rosch that Jones should be limited to sedentary work. ALJ Abrams asked Dr. Slodki if Jones could sustain work on a regular basis, or whether the medication she was taking would prohibit such exertion. Dr. Slodki did not state that Jones could work on an ongoing basis. He stressed that each individual was different. Dr. Slodki admitted, however, that the dosage level of Jones' medications was "considerable" and "would definitely impact [her] persistence and pace." (R. 85). The ALJ noted that Jones had stated that she felt sleepy from her medications and asked Dr. Slodki if the drugs could produce such side effects. Dr. Slodki responded: "If I took these medications, I'd be unconscious."[1] (R. 85).

_____

[1] The ALJ also took testimony from vocational expert ("VE") Stephen Sprauer. The Court does not review Mr. Sprauer's testimony because Jones' Step 5 challenge stated

### D.    The ALJ's Decision

ALJ Abrams issued a written decision on April 26, 2011 that found Jones to be not disabled.  She determined at Step 1 that Jones had not engaged in substantial gainful activity since her alleged onset date of July 30, 2008.  Plaintiff's severe impairments at Step 2 were identified as post bariatric surgery, moderate obesity, degenerative bilateral joint disease of the knees, and mild degenerative disc disease of the lumbar spine.  The ALJ noted that Jones' depression was secondary to her other conditions.  Nevertheless, she applied the "special technique" required under 20 C.F.R. § 1520(a) for assessing the severity of mental disorders.  The ALJ concluded that Jones had mild limitations in her activities of daily living, social functioning, and concentration.  No episodes of decompensation were noted.  None of Jones' severe impairments were found at Step 3 to meet or medically equal a Listing.

Before moving to Step 4, the ALJ assessed the credibility of Jones' subjective statements.  She determined that Plaintiff's testimony was not credible insofar as it conflicted with the ALJ's RFC, which limited Jones to sedentary work.  Numerous exertional, postural, and environmental limitations were added.  No restrictions were included that accounted for Jones' alleged difficulties in concentration, persistence, and pace.  Based on this RFC, the ALJ found at Step 4 that Jones could not perform her past relevant work.  The ALJ heard testimony from the VE at Step 5 and concluded that Jones was not disabled.  (R. 21-33).

---

below does not require an analysis of the VE's statements.

### III.  Discussion

Jones challenges the ALJ's decision on three grounds.  She claims first that the ALJ improperly weighed the statements provided by Dr. Shah.  Jones also argues that the ALJ improperly assessed her credibility.   Finally, Jones contends that, based on the "great weight" the ALJ gave to Dr. Rosch, the ALJ was required to ask the VE about certain pain-related coping skills noted by Dr. Rosch.  The Court addresses each of these arguments in turn.

### A.      The ALJ Improperly Weighed Dr. Shah's Opinion

Jones claims that the ALJ erred by rejecting the opinion of her treating physician Dr. Sumin Shah.  As the Commissioner points out, however, the ALJ did not reject Dr. Shah's reports.   She discounted his medical opinion by giving it "some" weight instead of controlling weight.  The Court follows the Commissioner in construing Jones' argument to be that the ALJ failed to provide good reasons for this weight.

An ALJ is required to evaluate every medical opinion in the record.  20 C.F.R. § 404.1527(d).  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence.  20 C.F.R. § 404.1527(d)(1)-(6).   The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision.  *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).  "A treating physician's opinion is entitled to controlling

weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Dr. Shah issued an Arthritic Report in October 2009 stating that Jones could sit and stand for an hour at a time, with 30 minute shifts in position. (R. 526-27). He also issued a June 15, 2010 letter concluding that Plaintiff could stand for 30 minutes due to the arthritis in her knees. (R. 601). Unlike the 2009 Report, the 2010 letter also included limitations on Jones' ability to bend, crawl, and stoop. It further limited Jones to lifting no more than ten pounds at a time. The ALJ assigned "some" weight to Dr. Shah's statements instead of giving it controlling weight. In support, she relied primarily on internal inconsistencies between the 2009 report and the 2010 letter. The ALJ also cited conflicts between Dr. Shah and the opinions of Dr. Rosch and Dr. Slodki, as well as inconsistences with the medical record. (R. 29).

The ALJ found it "significant" that the Report did not assess as wide a range of limitations as the 2010 letter, stating that "[a] very complete detailing [of] all of the claimant's limitations as of October 2009, would have been anticipated." (R. 29). This conclusion, which formed an important basis for the ALJ's analysis, fails to account for what Dr. Shah was asked to evaluate in the 2009 Arthritic Report. The assessment was provided pursuant to a pre-printed form supplied by the State of Illinois Disability Determination Services. (R. 525). The ALJ did not cite any portion of the 2009 Report that Dr. Shah failed to respond to, although some functional areas were left unmarked because he did not believe that any limitations existed. The limitations included for the first time in the 2010 letter – bending, crawling, general lifting, and stooping – are nowhere to be found

10

in the questions asked in the Arthritic Report.  Before faulting Dr. Shah for not providing a more detailed assessment of Jones' functioning, the ALJ was obligated to explain what part of the form gave rise to that expectation, or why Dr. Shah should have known that he was required to state more than what the form asked of him.

The Commissioner attempts to defend the ALJ by arguing that Dr. Shah failed to answer a question concerning Jones' ability to lift ten pounds at a time.  The Court respectfully disagrees with this interpretation of the Arthritic Report.  The pre-printed form contains a series of inquiries concerning the limitations associated with a claimant's use of an assistive device.  The question cited by the Commissioner asks: "Is the individual able to use the unoccupied upper extremity for normal lifting/carrying, for example, 10 pounds?"  (R. 526).  This inquiry only relates to an individual's ability to lift with an "unoccupied" arm when the other arm is "occupied" by using an assistive device.  Dr. Shah noted in his responses that Jones does not use an assistive device.  Thus, he was not required to answer questions specifically limited to claimants who *do* use one.  No other part of the Arthritic Report asked about Jones' ability to lift, and the ALJ had no ground for faulting Dr. Shah on this point.

The ALJ also criticized Dr. Shah's reports because they were allegedly inconsistent with one another.  The most significant difference between the two is that Dr. Shah assessed Jones' ability to stand as one hour at a stretch in the 2009 report, but stated in the 2010 letter that it was only 30 minutes.  Relying on *Griffith v. Callahan*, 138 F.3d 1150 (7th Cir. 1998), the Commissioner suggests that this inconsistency is in itself a sufficient ground for giving less weight to a physician's opinion.  In *Callahan*, a treating physician stated at one point that a claimant could work because she had good verbal skills and

could perform secretarial work.  He later concluded that she could not work because she was nervous and required self-catherization.  *Id*. at 1155.  The Seventh Circuit found that the ALJ was not required to include the doctor's later opinion in the RFC because the record did not support his changed view.

Unlike in *Callahan*, however, the record in this case suggests that Jones' medical condition changed during the eight months that separate the 2009 and 2010 reports.  Dr. Shah cited knee pain as the primary factor that limited Jones' ability to stand in 2010.  The ALJ noted that Jones had received her first steroid knee injection in September 2009, only shortly before Dr. Shah issued the October 2009 Arthritic Report.  (R. 28).  But Jones continued to have more injections after the Report.  Dr. Shah noted that they were required every three months.[2]  The record is clear that Jones' knee condition worsened during this period, in part, because she developed serious tears to the miniscus in both of her knees by the time Dr. Shah issued his 2010 letter. (R. 602).  Indeed, Jones had bi-lateral knee surgery one month after the letter was written.  The ALJ was required to consider whether Dr. Shah's changed opinion on Jones' ability to stand reflected these changes in her knees, or whether it constituted a mere inconsistency that was not supported by the record. Without doing so, she failed to build a logical bridge from the record to her conclusion.

The ALJ also discounted Dr. Shah's opinion because parts of his assessments conflicted with the views of Dr. Rosch.[3]  An ALJ can give less weight to a treating

---

[2]  The 2009 Report also cites a three-month interval, but does not link it to Jones' knee injections.  The Report's primary concern is with the steroid injections Jones had to her spine.  (R. 527).

[3]  The ALJ also cited the conflicting view of Dr. Slodki.  Dr. Slodki stated that he agreed with Dr. Rosch's RFC assessment.  He did not provide an independent analysis of

physician's opinion if it is inconsistent with the view of a consulting physician.  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).   Under these facts, however, that is not a sufficient reason for affirming the ALJ's decision.   The factors discussed above were the primary reasons for the ALJ's decision.   She cited no particular conflict with Dr. Rosch, stating only that Dr. Shah was given weight to the extent that his opinion did not conflict with Dr. Rosch's evaluation.

In addition, the ALJ failed to explain why Dr. Shah's opinion was discounted because of alleged internal inconsistencies, but Dr. Rosch's opinion was not.   The ALJ stated that Dr. Rosch believed Jones could stand and walk for thirty minutes at a time.  (R. 30).  Dr. Rosch did include a handwritten note stating that Jones could "stand 30 minutes." (R. 634).   The ALJ overlooked, however, that Dr. Rosch also checked a box indicating that Jones could only stand for 15 minutes at a time.  (R. 634).   Moreover, Dr. Rosch stated that Jones could lift and carry up to 10 pounds "occasionally" (meaning up to one-third of the time), but she also indicated that Jones could do so "frequently" (two-thirds of the time). (R. 633).  Lifting up to 10 pounds occasionally is associated with sedentary work; doing so frequently is a feature of light work.   20 C.F.R. §§ 404.1567(a), 404.1567(b).   If the ALJ believed that Dr. Rosch provided a standard against which Dr. Shah should be measured, she was required to explain why the same criterion of internal consistency was not applied to Dr. Rosch's opinion.[4]   For these reasons, Jones' motion is granted on this issue.

─────────────────────

Jones' functional limitations.

[4]  The shortcomings of the ALJ's evaluation of the physician reports is further shown by her treatment of state agency physician Dr. Sandra Bilinsky.  Dr. Bilinsky concluded that Jones could occasionally lift up to 20 pounds and could lift 10 pounds frequently.  The ALJ gave this opinion "moderate" weight because it was "generally consistent with" the ALJ's

## B.     The ALJ Improperly Assessed Jones' Credibility

Jones next argues that the ALJ did not properly assess her credibility.  If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.   SSR 96-7p.   The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible.  Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses."  *Craft*, 539 F.3d at 678.

The ALJ considered a number of these factors.  For example, she recounted Jones' activities of daily living in detail, made a thorough review of the medical record, and noted at least some (though not all) of Jones' medications.  Jones argues, however, that the ALJ failed to account for crucial side effects of her medications.  The medications included daily doses of Norco, Valium, Skelaxin, and a Fentanyl patch.   (R. 584).

---

own RFC.  Setting aside the merits of such reasoning, the ALJ rejected Dr. Bilinsky's limitations on lifting even though she gave the state agency doctor's opinion greater weight than Dr. Shah's.  The ALJ must be mindful that "when the record contains opinions of both treating physicians and nonexamining physicians, courts have agreed that the opinions of the treating physicians must be given extra weight."  *Ulloa v. Barnhart*, 419 F. Supp.2d 1027, 1036 (N.D. Ill. 2006).

14

Jones claimed at the hearing that these medications adversely affected her ability to concentrate and to focus. The ALJ took note of this complaint and asked Dr. Slodki to comment on it. He stated that the effects would depend on each individual, but that Jones was "on heavy medication" at dosages that were "considerable." (R. 85, 86). Even omitting the effects of Valium, Dr. Slodki believed that "between the Narco [sic] and the Vicodin and the Fentanyl, alone would definitely impact persistence and pace." The ALJ asked Dr. Slodki if Jones' alleged symptoms were within the expected side effects of her medications, given that each person was unique. Dr. Slodki responded: "If I took these medications, I'd be unconscious." (R. 85). The ALJ concluded without further explanation that Dr. Slodki had testified that Jones' side effects were "possible" and that the record did not support Jones' claims.

The ALJ's discussion failed to build a logical bridge between Dr. Slodki's testimony and the credibility assessment. Dr. Slodki did not say that it was "possible" that Jones' persistence would be affected; he testified unambiguously that her medications "would definitely" inhibit her concentration, persistence, and pace. The ALJ's task was to determine the degree to which Jones' allegations on this issue were credible. It was not enough to conclude without further discussion that the severity of Jones' side effects "have not been established." The most reasonable inference from Dr. Slodki's statement that Jones' medications would render the doctor himself unconscious – important testimony that the ALJ never mentioned – is that Jones would be affected by them in some way. If the ALJ believed that a different conclusion was in order, she was required to discuss the grounds for reaching her finding. Simply stating that each person is unique was not sufficient to account for Dr. Slodki's forceful response on this issue. Dr. Slodki did not state

that Jones was so different from himself that she would not experience her alleged side effects.

The ALJ's problematic account of the record is deepened by her reliance on the following language she quoted when considering Dr. Slodki's testimony:

> No symptoms or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individuals' [sic] complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

(R. 30). The ALJ concluded that this language from SSR 96-7p means that the "mere possibility that the symptoms could produce the symptoms is not sufficient, without those [evidentiary] findings." (R. 30). She then applied this standard to reject a finding that Dr. Slodki's testimony supported Jones' alleged medication side effects.

The ALJ's discussion of this issue raises serious concerns about the legal standard she applied to the credibility assessment. The language cited from SSR 96-7p defines the relationship between symptoms and the medical evidence that is required before a claimant can be found to be disabled. It says nothing about how an ALJ goes about assessing a claimant's credibility. The ALJ appears to have construed the quote as requiring complete evidentiary support before she could find that Jones' alleged symptoms were credible. That was incorrect. An ALJ makes credibility decisions when the objective record does *not* fully support a claimant's statements. *See* SSR 96-7p (stating that credibility assessments are in order only when a claimant's alleged symptoms "are not substantiated by objective medical evidence"). Credibility analyses are superfluous when the record substantiates a claimant's allegations.

The ALJ's point is particularly difficult to decipher in this case because she herself

16

found that Jones' "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 27). This boilerplate phrase is cited in cases of this type before an ALJ proceeds to the credibility assessment. The ALJ did so here. By repeating it in connection with Dr. Slodki, however, the ALJ implied that an important evidentiary support was missing, and that its absence supported giving less weight to Jones' testimony. Perhaps the ALJ overlooked her own finding that Jones' symptoms could be expected in light of her medically-determined impairments. Or perhaps the ALJ merely misconstrued the proper relationship between the objective record and a credibility assessment. The problem is that the Court cannot determine what the ALJ meant by her reliance on the quoted language, or what relationship she was attempting to describe between Dr. Slodki, the record, and Jones' credibility.

That uncertainty is heightened by the ALJ's enigmatic conclusion that the "mere possibility that the symptoms could produce the symptoms is not sufficient" to establish Jones' credibility without objective evidence. The ALJ was correct to stress the importance of the medical record. But SSR 96-7p emphasizes that an ALJ may not set aside a claimant's allegations just because the record does not fully support them. The Ruling underscores the point by stating in italics that "*allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence*." SSR 96-7p. On remand, the ALJ shall clarify the legal standard she applies to assessing Jones' credibility in light of the medical record.

The Commissioner argues that substantial evidence still supports the ALJ's reasoning because the ALJ noted that other physicians had found that Jones' narcotic

17

medication would not have adverse side effects. One of these doctors was Dr. Shah. The ALJ stated that Dr. Shah had made a "notation that there are no side effects from the claimant's medications." (R. 30). However, the ALJ had no ground for relying on this comment for evaluating Jones' statements. Dr. Shah's comments on side effects only concerned the results of Jones' non-narcotic epidural injections. He gave no opinion on the side effects of Vicodin, Norco, or any muscle relaxant. (R. 527). Thus, Dr. Shah's comments are not relevant to the credibility issue because Jones did not claim that the steroid injections created adverse side effects.

Like the ALJ, the Commissioner also cites the fact that pain specialist Dr. Brown did not believe that any risks existed with Jones' use of narcotics. Dr. Brown did note that no adverse side effects were present. (R. 379). But that provides less support than the ALJ seems to have thought. Dr. Brown's primary focus was not on Jones' side effects, but on determining whether Jones should continue using narcotics in light of suspicions that she was abusing her pain medication. He concluded that she should. Moreover, Dr. Brown only considered Jones' use of narcotic medications. Plaintiff's complaints about side effects at the hearing were based on narcotics and the muscle relaxants Valium and Skelaxin. Dr. Brown's report does not suggest that he considered these medications. The ALJ did not explain how Dr. Brown's consideration of the side effects of narcotics could be extended to the potent muscle relaxants Jones was also taking. Jones' motion is granted on the credibility issue.

### C. The ALJ Did Not Err at Step 5

Finally, Jones claims that the ALJ erred by not including a particular limitation in the hypothetical questions posed to the VE. Dr. Rosch stated in her expert report that Jones

was not a candidate for surgery "due to depression – claimant with poor coping skills to pain." (R. 640). The ALJ gave great weight to Dr. Rosch. Jones argues that this assessment required the ALJ to include a restriction concerning her coping skills as part of the questions asked of the VE. An ALJ must always "incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Not every limitation meets this standard. Only those supported by medical evidence in the record must be included in the hypothetical. *Ragsdale v. Shalala*, 53 F.3d 816, 818 (7th Cir. 1995).

The Court disagrees that the ALJ erred by not including a restriction in Jones' coping skills in the Step 5 questions. The fact that the ALJ gave great weight to Dr. Rosch does not necessarily mean that she was required to adopt every statement in the expert report. Dr. Rosch's comment was made in the context of Jones' depression and pain. The ALJ considered this issue when she found at Step 2 that Jones' depression was secondary to pain and did not cause more than minimal limitations in Jones' functioning. (R. 23). All functional limitations related to Jones' activities of daily living, social functioning, and concentration were found to be mild. Jones does not challenge these findings. As a result, she has not shown why the ALJ should have found them so credible that they should have been included in the Step 5 questions. If the ALJ's credibility assessment on remand leads her to a different conclusion, she will be free to incorporate any limitations in Jones' coping skills in her hypothetical questions. The Commissioner's motion is granted on this issue.

## IV. <u>Conclusion</u>

For the reasons stated above, Plaintiff's and the Commissioner's motions for summary judgment [12, 22] are granted in part and denied in part. The ALJ's decision is

reversed, and the case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: May 1, 2013

20